Case number 21-3405, Wolverine Pipe Line Company v. Department of Transportation, Pipeline and Hazardous Materials Safety Administration. All arguments not to exceed 15 minutes per side. Mr. Joshua Stephan Johnson for the Wolverine Pipe Line Company. Your Honor, and may it please the Court, Joshua Johnson for petitioner of Wolverine Pipe Line Company. I would like to reserve three minutes for rebuttal. Great. The government in this case has violated basic principles of administrative law and due process. On item five, the immediate repair condition issue, PHMSA violated Wolverine's due process rights in the proceedings below by shifting to a novel theory of untimely discovery not alleged in PHMSA's pre-hearing notice. Let me ask you a threshold question that I think is not maybe all that relevant. We have former appellate staff lawyer from DOJ. We have current appellate staff lawyer. Terrific lawyers. This is great. I would have thought you'd been here fighting over more than $65,000, I'll have to say. This probably doesn't answer any legal question, but is there some incremental punishment that happens to your client? Is this sort of fighting this because if you're tagged again for a violation, there's an increased penalty? Is that kind of what's going on? That's absolutely part of the reason. There's a possibility of a recidivist enhancement in the case of a future enforcement action. Also, Wolverine thinks that the agency got it wrong here, and it wants to clarify its obligations going forward. Returning to the item five issue, PHMSA below relied on this theory of untimely discovery. Then on appeal, the government has moved the goalposts again. The government is now relying on an untenable interpretation of section 195.452H41 that the responsible administrators below went out of their way to avoid adopting. But fundamental administrative law principles preclude the government from changing rationales on appeals. This goes with the discovery date, June 10, June 26, I think? June 26 is the discovery date. June 10 is the report receipt date. The claim discovery date, according to your friend on the other side. The pipeline safety violation report that you received well before the hearing says the date the violation started, June 10, 2015. Why wasn't that enough to put you on notice of what the hearing was going to be about? The violation report is separate from the notice of probable violation. It equivocates a little bit, right? The charging document equivocates a little bit? I don't read the charging document as equivocating. It says one discovery date. It uses both dates. It says that the report was received on June 10. So the violation report is separate from the charging. Right, but why doesn't that clear? There's only one date here. Why doesn't that clarify it? The violation report is just something that's in the case file. It's not the charging document in this receipt. Something that was sent to you? It's something that we received before the hearing. In advance of the hearing. Yes, but Your Honor, even putting that issue aside. I haven't put it aside yet. Okay, well, this goes to the point that you're making. PHMSA's own regulations say that PHMSA is supposed to state in the charging document, the notice, what the alleged violation is, what regulatory provision has been violated. So if it wanted to allege a theory of untimely discovery, it needed to cite the H2 provision. The notice of violation, the charging document says it was an immediate repair condition. It's basically alleging an H4 violation, right? Correct. And it seems to me that the theory was always the same. You had enough information on the 10th to kind of get started, and you didn't. And by the time this rolls around to the 20th or whatever it is, then you spring into action. You get it done quickly. But I take it there, the problem is starting on June 10th. I thought the IMP said you're supposed to get started within five days of getting a report. Is that not right? That's an argument that the government is asserting. Okay, but yes or no, doesn't your IMP say you've got five days to kind of get started? I need to go back and look at that exactly. You can't claim that. I find it hard to believe that your client would say, well, we were surprised that this government theory that we should have gotten started before the 23rd surprises us. Because it seems to me that your own documents say that you're going to get your plan, which I assume the government approves, that you're going to get started with this thing. I mean, the guy didn't open his email for two weeks. I don't see how that's not a problem. I mean, what are we supposed to say? Hey, we're not going to start the clock running, or the agency shouldn't start the clock running until the email gets opened. So then you'll never open your email. You'll do it once a month or something. I think it's helpful to look at what PHMSA's enforcement representative, Nyla Alexander, said at the hearing. She was asked point blank, do you dispute the discovery date of June 26th? And she said no. That is what PHMSA's enforcement representative said. Right, but there's some dispute about that exchange and what the import of that exchange is. And the reconsideration decision, I think, deals with it in a footnote, right? It says she wasn't, his reading was she wasn't agreeing with the 26th, right? That just is not supported by the plain language of the transcript. It's not supported by substantial evidence. If you read the transcript, Ms. Alexander was asked a question in the beginning, and yes, that first statement. But we're deferring to that, right? I mean, you're just saying it's arbitrary and capricious that we should basically put the government to the 26th as the discovery date. And moving from that date, a pressure reduction didn't make any sense. The repair was done quickly, off the hook. On the interpretation of Nyla Alexander's testimony, we argued in our opening brief that that language in the reconsideration decision was not supported by substantial evidence. The government, in its brief, did not contest that. They did not take issue with our argument on that. So I think they forfeited that point to the extent that Your Honor may disagree with it. I think it's not in the case anymore. Why didn't you argue below? I understand there was some dispute about the date. And I understand you want it to be the 26th, and you put a lot of eggs in that basket. But why didn't you have an alternative argument that even if it was the 10th, the 10th was definitely put into question by the papers you received pre-hearing, and those were the two dates. Why didn't you have a backup argument that even if it was the 10th, you'd still win, and here's why? Well, I think that to the extent we might have presented such a backup argument at the hearing, it really became unnecessary once we asked Finns' representative. I mean, you're putting a lot of reliance on that one exchange that was equivocal. Your Honor, also, I can't speak for why Moore wasn't presented below, but I would say taking a step back, the government on appeal is not even relying on that untimely discovery issue. So at the hearing below, we established the discovery date's not in dispute. We made our argument about why there was no violation if you assume June 26th is the discovery date. Post-hearing, PHMSA apparently decided that it could not establish a violation if you accepted June 26th as the discovery date, so it began pushing on that discovery date. And then we get up on appeal, and the government seems to have reverted to where we understood the agency to be before the hearing. Well, after the exchange with the inspector, the counsel says, well, that's the inspector's view, but it's not the agency's view necessarily on the discovery date, June 26th, right? There's exchange between counsel in the hearing, and counsel says, didn't adopt June 26th. Counsel for the agency didn't adopt June 26th. The counsel for the agency, there was a statement to the effect of that is what Wolverine's claiming. Yes, there was that exchange. I guess my view is if there had not been the pre-filing papers, and you just show up at the hearing, and the inspector says, I don't know, there's two dates here, I'm not sure, I would be leery to think that the government did give you proper notice, if the main witness is sort of equivocating. But in my mind, the papers they gave you ahead of time made June 10 the more likely date, at least put both dates into question, but made June 10 the more likely date. And so in advance of the hearing, I feel like you sort of did have notice about both dates, and I realize things at the hearing kind of maybe mucked it up a little bit. Right. Well, even if you might say that as a factual matter, there was some ambiguity as to whether the discovery date would be at issue, what PHMSA should have done is alleged a violation of the discovery provision, H2, in the notice. PHMSA did not do that. Its own regulation, 49 CFR 190.207B1, required it to do that, if it wanted to allege that we did not discover this condition quickly enough. Do you guys dispute it was an immediate repair condition? No, we do not. And, Your Honors, if there are no more questions on this immediate repair condition issue, I guess the final thing I would say is that, well, two things. First of all, there was no finding below by the agency that if you assume June 26 is the discovery date, there was a violation of the H41 provision. And the government on appeal is now arguing that you can accept June 26 as the discovery date, and there was still a violation, but that's not what the agency said below. And if you accept June 26 as the discovery date, Wolverine complied with the provisions of its integrity management program by completing the repair within five days. How does that matter vis-a-vis the regulations? I think it matters because PHMSA, in this enforcement proceeding, reviewed the integrity management program and didn't object to this provision, even though it could have, that gave Wolverine the ability to do a repair within five business days. So this silence was basically acquiescence? Well, I think PHMSA would have objected to this provision that categorically allows Wolverine to do repairs without taking pressure reductions if it truly believed that that provision was in conflict with PHMSA's regulations. Fair point. It may have, it may not have, but fair point. If I could just briefly turn to item six. So the potential rationales that could be teased from the orders below on this issue appear to have been so clearly meritless that the government has tried to invent a new theory on appeal. Again, fundamental principles of administrative law do not allow that, but even putting that aside, the government's new argument conflicts with the undisputed record evidence that Wolverine's integrity management program Can I ask you a question about the, so the reg says if a calculation shows a problem, then do you have to, it's a 180 day condition, you can use any of these, you know, R string, whatever, however you pronounce, I don't even know what you guys say, how you call it. Anyway, there was a calculation that showed a problem. Why doesn't that take care of it? In other words, you're saying, yes, there's a calculation that shows we would have been okay, but if I have one that shows I'm okay and one that says I'm not okay, you know, why do we say, okay, we're fine, as opposed to you're not okay? So I understand the argument. I don't take that to be the interpretation that PHMSA took below or that the government's taking on appeal, and let me explain why I don't think it would be a reasonable interpretation. It will generally be the case, maybe always the case, that R string is going to be a higher value than B31G because it's a more precise calculation. So the regulation, and my understanding is that in the industry, people generally run both calculations. So under that kind of interpretation, the provision allowing for the use of R string would essentially never have effect because you would always be bound by the lower B31G calculation. Right, but that's a problem both ways, right? Because then you would be, then the industry would say, if we can find one calculation that makes us okay, we'll always use that one. The government would always point to a different one if they could. So then eventually you wouldn't use both, I suppose. You would just use one. But, I mean, isn't there some, there's some dispute, it seems to me, with this reg about whether, I understand there could be arguments made either way, but, I mean, the language of the reg says A calculation, and I'm just looking, the first thing I have to do is read the reg. So I'm not sure why A calculation wasn't met here. Understood, Your Honor. What I would say is in this highly complex area, this court should be hesitant to impose an interpretation of the regulation that even the responsible agency has not adopted. This is not an interpretation that PHMSA has adopted. Its interpretation was you can use both calculations on the front end, you can choose between the calculations, but once you choose one of the calculations, you're forever bound by the calculation you've chosen, and that kind of choice directive just isn't in the language of the reg. It's adding words to the reg. I thought you all admitted, though, that there was a violation at one point. No, we did not. We did not admit that there was a violation of the reg. Or not a violation, but that there was a problem. Or maybe it was a violation. We acknowledge the clear fact that we did not satisfy the 180 deadline that we had set for ourselves based on B31G, but that's different than saying that we couldn't have instead relied on our string. That's not admitting that there was a regulatory violation. But it seems odd that you would go through this whole time period, you would act as if there's a problem. I assume maybe you did or did not represent to the government at some point that there was a problem, that you were taking care of it, that you were repairing it, and then when did you decide that, oh, wait a minute, it's actually not a problem, we had this other calculation available, and we're just going to use that one. Well, we acknowledge that we did not satisfy the 180 deadline, a day deadline that we had set for ourselves, but then in the context of these enforcement proceedings, Wolverine defended itself, and it presented an argument that there was no 180-day condition to begin with because of the R-string calculation. I guess I could imagine a pretty good arbitrary and capricious argument had you relied on R-string and not fixed within 100 days, and the government comes in and says, no, you had to rely on the other one. And you're like, well, this is ambiguous. I don't think you should defer to your interpretation. But that's not what happened. You picked the one that was worse for your client in a way and relied on that and implemented a plan. I mean, adopted that as the test, the calculation, a calculation, and then didn't meet the 180 days. So in that factual context, it feels to me like the arbitrary and capriciousness is lowered quite a bit. What I think would be arbitrary and capricious is to set up a system that discourages operators from running conservative calculations or from building voluntary repair plans based on conservative calculations. If that type of interpretation were adopted, then operators would be encouraged to always rely on R-string and just disregard B31G. And I think that that would be the problematic arbitrary and capriciousness. And that's what I sort of expected you to do, and I might agree. It's just the factual sequence here is different. There's no doubt that on the front end, our client relied on it. Perfectly no good deed goes unpunished. I realize that. Right, exactly. I guess I'm struggling with this sequence of events that unfolded here to say that this decision below, either it's arbitrary and capricious or we can't defer to the determination of the agency. I guess the final thing I would say is, Your Honor, the agency at minimum had an obligation to clearly explain its rationale, and I think at minimum the agency has not done that here, and so at minimum the court should remand for the agency to explain exactly what rationale it was for. Is there a rationale that this 10,000 test point, like you could run 10,000 tests and pick one? Well, I think that that's part of the issue because that shows that Your Honor, Judge Nalbandian, your proposed interpretation of the regulation cannot be correct because PHMSA said you could run 10,000 calculations, and it didn't suggest that if just one of those meets the regulatory benchmark for 180-day conditions, you're going to be bound by that and you have to ignore the 9,999 other calculations that say that there's no problem here. Okay. Judge Machelman, anything? No. Okay. Thank you, counsel. You'll have your rebuttal. Let's hear from the counsel for the government. Thank you, Your Honor. Case in Ross for the Department of Transportation. This case involves a straightforward interpretation of the pipeline safety regulations. The Pipeline and Hazardous Materials Safety Administration, or PHMSA, determined that Wolverine violated those regulations in two respects and assessed a civil penalty. That determination, affirmed by the associate administrator in a final order and on reconsideration, was not arbitrary and capricious. Straightforward is kind of a generous description, I think. What date did the administrator determine that Wolverine was on notice of the pipeline issue? It wasn't June 10, was it? The associate administrator actually made no determination, Your Honor, because it doesn't matter. That's because there was a question of whether Wolverine violated the regulation in the first instance, that is, whether they conducted a repair at all. And so the discovery date goes to whether they actually conducted that repair. At the top of page 5 of the appendix, the associate administrator explicitly explains that there was some question over whether the repair condition was actually fixed. What was not in question was that Wolverine didn't do what the regulation requires, that is, it didn't comply with the... It could have been June 26, because I agree with you, the arbitrary doesn't say, so we don't know what the date is. That's right. It could have been June 26. Correct. And they fixed it within three or four days and within the confines of their own internal plan, which you guys have seen, or which your client had seen and at least not objected to. Assuming June 26 was the operative date, that's correct. Yeah, so what's... Your position is that they always have to, if they can do a quick fix, they nonetheless have to do the pressure testing first in every instance? Not pressure... Or the relieving, if the pressure is over, they have to relieve it, irrespective of whether they can fix it very quickly? Yes, that's correct, Your Honor. It would never be arbitrary and capricious? It would never? So if it would take me three days to do a pressure reduction and two days to repair it, I should still do the pressure reduction, then take the two days to repair it? That's what the regulation requires, Your Honor. That makes no sense. Respectfully, Your Honor, Wolverine doesn't challenge the legality of the regulation itself or whether that requirement is arbitrary and capricious. They challenge whether the assessment of the penalty was. I'm confused. What's the difference? Sure. They challenge whether the determination that there was a violation of the regulation was arbitrary and capricious. They don't challenge the legality of the regulation itself. And that's an important distinction here because these pipeline safety regulations, especially this particular one, are operated in what are called high consequence areas. This particular dented pipeline was roughly 25 miles west of Grand Rapids, Michigan, near what I understand is Lake Makatawa. Apologies if I mispronunciated that, which is both a commercially navigable waterway, a high population area, and drains directly into Lake Michigan. So a consequence from any safety failure during the repair itself is incredibly significant. This is just the same way that construction workers are required to wear hard hats in construction areas. It seems to me that the better story or the better, the problem in this case really was that the guy didn't open his email up immediately and get started. I don't know why that isn't the main problem here. I mean, you can't just sit on your hands for two weeks and then get started. That's exactly the concern that the associate administrator opined on in both the final order and on reconsideration. That is a substantial concern. Basically, Wolverine had a single point of failure in this respect. So one particular employee's absence... Do you have to have a specific discovery date? Or can you just say, look, I don't know exactly what was going on, but you basically just failed to exercise due diligence here. It's an immediate repair condition. When you don't exercise due diligence with regard to an immediate repair condition, we're going to fine you. So that is a separate violation. As opposing counsel identified, subsection H2 of this 195.452H2 could also be... Oh, okay. So you think that if I spin that out, you're saying that that would be an H2 violation? That would be a failure to discover in a timely manner? Correct, or act promptly, as the regulation more specifically states. That's correct. But that was not the basis for the violation here. No, I understand that, but now I'm a little bit confused about it because it seems like that's what the real... It's what it seems like the problem was. No, Your Honor. I'm just looking at the notice of violation, which seems to... And then the language from the reconsideration decision or the original decision, which talked about... Which emphasized, in my mind, the failure to act quickly, to open your email, to have somebody else that could address this, whatever it is. Why doesn't all that go to what would have been an H2 violation, in your words, but it's not being charged as an H2 violation? Because that's not what PHMSA, in its enforcement discretion, decided to... Why? I can't say, Your Honor. I'm defending the agency's decision here, but I will point you to page 21 of the appendix, which states, and I'll just read from it quickly, this finding of violation as to item 5 is and has always been squarely focused on the fact that Wolverine never took a pressure reduction or shut down the pipeline after an immediate repair condition was found on its pipeline. That's the basis of liability here, plain and simple. Okay, so it does seem to me that there could be an H2 discovery date, I suppose, could be different than when you should act on an immediate repair condition. Is that right, or does it hinge on H2 to H4? I'm not sure, Your Honor. I think that's right, but frankly, I'm just not sure. Well, does it have to be right for you to prevail? No, and that's because the discovery date doesn't matter here because the ultimate finding of violation was not based on when Wolverine began the repair. It's that Wolverine didn't do the repair correctly. Maybe it's worth analyzing. Because they didn't do the test. They didn't relieve the pressure. Correct. They didn't relieve or shut off the pressure. I mean, is it possible that they discovered this? Probably not on the very same day that they fixed it. In other words, they're sort of boxed in to the 26th being the latest date, I suppose. Sorry, I'm not sure. I mean, suppose they had fixed it on the 26th. That would still be a violation, Your Honor. That's a pretty aggressive reading of the regulation. That's what the plain text of the regulation requires. And perhaps it's worth analogizing to something more concrete to your everyday experience, which is a leaky stove in your kitchen. If a leaky gas stove is in your kitchen, you would most sensibly shut off the pressure before fixing the pipe to the stove. That assumes there's a quick way to do it. If the fix was two minutes and the other relieving the pressure is two hours, you would just do the two minutes. So there could be some sequence in which the repair is faster than relieving the pressure. That might be the case, Your Honor. But in PHMSA's expert safety determination, it's that taking the action you prescribed, the two minutes versus two hours, that creates a huge safety concern. Because, returning to the stove example, there could be a stray spark or match lit in that two-minute period, which would cause a substantially greater consequence rather than simply shutting off the pressure over the two-hour period. So are you saying that there isn't any circumstance in which a repair can be made without shutting off the pressure? Under H4 Romanet 1. That's correct, Your Honor. So if there is an immediate repair condition, it's worth emphasizing that these are in so-called high-consequence areas where adverse effects from pipeline failure would have particularly significant harm either to densely populated areas or to the environment or commercially navigable waterways, that PHMSA made this determination that pipeline operators must take this particular action. And again, as I responded to Judge Nalbandian's question, that underlying legal determination, the legality of the regulation, is not challenged here. So your friend on the other side relies quite a bit on the equivocation of the inspector at the hearing between the two different dates. I guess your point is it doesn't matter? That's correct. Is that right? I mean, there has to be some notice obviously provided by the agency to the regulated party. And your point is it could be a whole two-week period. We don't have to say the exact date. Isn't there some obligation on the agency to be a little more straightforward with the case they're presenting? I realize you're going to say that even if it's 26, you still win. But, I mean, this was not a model of clarity. I think you'd assume you'd concede that. Whether the regulations are clear. The presentation of the relevant dates to the regulated entity. But at all points, Wolverine has acknowledged and didn't dispute that it didn't shut down or reduce the pipeline pressure and was on notice of that in the notice of proposed violation as well as in the final order and on reconsideration. That has not been contested at any point and is still not contested here. The only thing I feel like they've conceded is that by the 26th they were on notice. They contest whether they were on notice of the particular discovery date. Our response is the discovery date doesn't matter. At any point, and in any event, PHMSA didn't charge them for a delayed repair. But when did they have to shut the pressure down? When they were completing the repair. I'm not sure of the exact dates. They completed the repair by June 30, 2015, I believe. I assume, let's say that I know there's a problem. Let's say that I can't get the truck out there until tomorrow. You're saying I've got to shut down the pressure today, right? I'm saying that when you complete the repair, you need to shut off or reduce the pressure. You mean while I'm physically working on the repair, the pressure needs to be shut off? I don't understand. I don't know what that means. I heard you say, hey, you knew this was a big problem. You knew that you had to immediately repair it. The first thing you have to do is shut down the pressure, then fix it, then turn the pressure back on. That's correct. Okay. When do you have to turn the pressure off? I see. I would say promptly. That's what the regulations require, promptly. And there again, that is not the basis for the violation here. It is that they didn't turn off or reduce the pressure at all. And there's no scenario where I could do the repair without shutting off the pressure? Not these particular immediate repair conditions and for this particularly dented pipe. Okay. Can I ask you about the other issue in the case? Of course. Yes, Your Honor. So what is your understanding of a calculation? Because it does feel to me like there's a little bit of no good deed goes unpunished aspect here for Wolverine where they have one calculation for which they wouldn't have to do anything in 180 days, but they accept the other one. So how do you read that? The first question, I guess, is how do you read that, the A calculation language? I think exactly as Judge Nalbandian was suggesting to opposing counsel, that once the operator conducts a calculation under either of the methods prescribed and acts on it, then they are held to that timeline. It's not that there is a – It's the combination of the test and the action? If they had selected our string or whatever it is, we wouldn't be here today? There would not have been a finding of violation, I don't believe. Really quite something. So the agency's view is that the regulated entity just picks the one they like? They can sort of cherry pick? Yes, absolutely, Your Honor. So the regulations actually provide substantial flexibility on the front end, but that comes with the need for verification on the back end. And so PHMSA is unable to monitor the safety of our nation's pipelines in real time. They only do so by inspecting those records at some later point. And so here, Wolverine didn't have any records. That's quite funny because in the one regulation you're so absolutist that even if they can fix it in 10 seconds, they still have to relieve the pressure. Here it's, wow, it's all the discretion to the regulated party. If they have one test that doesn't show a problem, they can rely on that one, it's all fine. That may be the case, but there's a little inconsistency between the approaches to the two rules. Well, this particular violation, Item 6, goes to the choice between various calculation methods. The other goes to the necessity for shutting off the pipeline. If I do five calculations and one of them shows a problem, do I have to fix it? Not necessarily, Your Honor. To Judge Radler's question, if Wolverine had calculated the pressure here under the R-string method, they would not have had to, or they wouldn't have identified a pipeline anomaly. Okay, so if I do five calculations, all I have to do is find one of them that says I'm okay. Four of them say I've got a problem. One says I don't have a problem. I don't have a problem? That is your choice to act on that condition as you see fit. It's worth noting that… That's whose choice? The pipeline operators. I'm sorry. Okay, but what is the agency's interpretation of the reg? So then A calculation doesn't mean… A calculation actually means if there's A calculation that shows you're in the clear, you're in the clear? Not necessarily. Does that mean the calculation you rely on? It's the calculation that the pipeline operator performs. So here, it's worth looking at the factual context a bit. First of all, your brief suggests that the R-string is not allowed in their IMP, but I think it is clearly. Do you agree with that? I dispute that reading of their IMP. There is one reference to R-string method that it might be included in a particular inspection report, but their IMP actually goes on at length to say that their engineers need to be qualified under this method. It is integral to assessing pipeline conditions, et cetera. But that's sort of beside the point. Let's assume that they're allowed to use R-string. Yes, they are. Yes. Okay. They did it. They have the column that says you're okay. Why is that not good then? So that's where I was going to sort of zoom out a bit. So in April 2015, they received this in-line inspection report, which contained both R-string and B31G calculations. In the subsequent six-month period, they only performed B31G calculations to confirm what the report said. And in fact, the agency delayed the discovery date for purposes of these pipeline anomalies a subsequent six months based on Wolverine's assertion that it conducted a number of calculations to verify whether the strength of its pipeline was below the maximum operating pressure. And for two of those places, it did verify that. Wolverine did. So their own calculations based on... Was there ever government reliance? Was the government ever led to believe that there was a problem, that they were fixing it? I see. Was there ever anything where they represented or the government could say, okay, fine, you're treating this as a problem, that's fine, do what you're doing? I don't believe so. The inspection at issue here occurred some 18 months later in May to June 2017. And so there wasn't necessarily a reliance by the government. But when inspecting Wolverine's own records, that is when the engineers effectively conceded that they hadn't complied with the 180-day deadline because they didn't have any records. So then I don't understand. Go back to the beginning, the first report that says you're okay under R-string. If I can use that under my... Yes, I did a good deed. I treated it as a problem. I tried to fix it within 180 days. I couldn't do it, unfortunately. But it turns out, I mean, I was just being overly cautious. You can't punish me for that, right? That's not quite right, Your Honor. And that's because, as I said before, there is front-end flexibility with regards to choosing the calculation method. But PHMSA has to be able to verify an operator's compliance in doing so. But you just said you didn't do it. There's no government reliance. There was nothing that happened. I can understand if you say, yes, you have to make a decision at the beginning and choose one because for the rest of this proceeding, we are going to rely on that choice and we are going to rely to our detriment on that choice in conducting our own operations. But you're saying it doesn't matter. They just picked whatever they picked. And then later, post hoc, we go back and look at their records. So then why can't they just say, okay, we picked the other one? Well, that's exactly it, is they didn't have any records to justify their compliance with that by using that method, Your Honor. They have the initial report that says you're okay. Just the initial report, which they subsequently used the B31G method to identify substantial problems in their pipelines. And so they acted on that. This interpretation is good for the outcome of this case, so you win the battle. But I'm surprised the agency wants to lose the war in the sense that they're just leaving this totally in the hands of the pipeline company to pick and choose which study they want to use. The rule going forward, I suspect this will spread around the pipeline community, that this is the approach and the interpretations the agency is taking. It seems like the interpretation that provides for less safety rather than more. I dispute the premise, Your Honor, and that's because our string is more accurate and might not require action as frequently as B31G does. At the same time, a repair when identifying a pipeline anomaly under B31G is probably a minimal repair and doesn't require, I would imagine in most cases, a substantial repair. Well, they run both. If our thing doesn't show anything, they go with that. If they both show something, they do the B31G because it's a smaller repair. They just leave a lot of discretion in the hands of the agency. And the point earlier was that the pipe was going to blow up by the lake and in the first instance cause significant environmental harm and other things. And here it's just sort of lax. We trust the regulated party and we'll check it later, six months later or even after that. That's sort of exactly the point, Your Honor, and the nature of the agency's concern here is trusting the regulated entity, which is that they didn't have any basis for checking Wolverine's compliance with this particular R-String method because they didn't have any records demonstrating that. And that's the true nature of the concern here is that the agency, in assessing the safety of the pipelines, needs to be able to validate operators' compliance with the regulations. And because they couldn't do so here, they assessed a civil penalty. Isn't that because they opted? Couldn't they have done more testing? Are you saying in R-String they couldn't have met the agency's requirements for documentation or verification? That's correct. And they could have done more with that if they chose that one, right? Yes. And so then they probably would have satisfied the agencies. Yes. And this seems, just because they didn't do enough process on that one because they chose the other one, but they may have been able to pursue the other one and do enough process and have the documentation. And that's the case, but that determination was not arbitrary and capricious. But this whole idea about documentation and all, I mean, that's not in the reg anywhere, is it? That they need to... This whole process, this whole 18-month thing where you relied on this calculation, you did the backup calculation, you verified it, you did all of this stuff. And so that was really the problem because you chose that method, and then we couldn't verify later, you don't have the backup data later. Right. Where is that in the... What is that in the reg? Like, where does that appear? So, I mean, there are record-keeping requirements in the regulation itself. Wolverine did not... Or, excuse me, PHMSA did not charge Wolverine with... Right. They're charged with just the 180-day repair condition problem. Correct. Okay. All right. Any other questions? Okay. Thank you. We urge the court to deny the petition. Okay. Rebuttal. Thank you, Your Honors. This case is why the chainery doctrine exists. So, the government stands up here today and says that the discovery date does not matter for Item 5. And as Judge Radler said, that is an aggressive interpretation of the regulation. But more importantly, it's not the interpretation of the regulation that PHMSA relied on below. There was just no finding by the responsible agency that if you assume a June 26 discovery date, Wolverine was still required to take a pressure reduction before completing its repair on June 30th. The Administrator didn't pick a specific date. But wasn't June 26 the last possible date he could have picked? June 26 is the last possible date. Right. Yes. No, he didn't pick a specific date, but it couldn't have been past June 26. Right. And you didn't repair the pipeline. I mean, you didn't relieve the pressure. That's correct. And under our IMP, we were not required to take a pressure reduction before we completed the repair. And, in fact, the hearing officer indicated at A391, the hearing transcript, that Wolverine completed the repair here before there was time to effectuate a pressure reduction, if you assume that June 26 discovery date. And let me explain why that's the case. Pressure reductions take time. There are a number of steps involved in a pressure reduction. In fact, PHMSA recognized that itself in its final order. Pressure reduction cannot be implemented immediately. There are a number of steps to make sure that a pressure reduction is implemented safely. So it does naturally. That's not what the reg requires. I understand there's a policy argument as to why this reg doesn't make sense in certain circumstances. We're not here challenging the initial implementation or adoption or issuance of the reg. Right. And we don't have to challenge the reg. This is about the proper interpretation of the reg. I don't want to use up all your time on this point, but to me it reads pretty clearly that you must do this. Well, what it says is to maintain safety, you must take a pressure reduction until the operator completes the repair. So it's a stopgap measure until the repair is completed. Here, Wolverine completed the repair, and the record indicates it did so before it could have safely implemented a pressure reduction. So I think the regulation is best. Assuming that it's the 26th. Assuming June 26th is the discovery. You could have done a pressure reduction on June 10th or 11th, and then if you fixed it two weeks later, then that would have complied with the reg, right? Well, Your Honor, presumably whenever we discovered the immediate repair condition, we would have implemented the repair quickly thereafter as we did. So I think in any case. Oh, so you're saying there never would have been a pressure reduction. I think that that's right. But you're not challenging the reg itself, right? We don't need to. It's the interpretation of the reg. This is not an interpretation of the reg that the responsible agency adopted below, and we don't think it's the best reading of the reg. It would be inconsistent with the objective, the express textual objective of the reg of maintaining safety. So the word must. To require. What does the word must mean then? It means that you must take a repair as a stopgap measure until. Sorry, you must take a pressure reduction as a stopgap measure until you complete the repair. But here the repair was completed. The record indicates before a pressure reduction could have been safely implemented. In that case, the plain language of the reg does not require a pressure reduction, and the alternative would be requiring that the repair be postponed until the pressure reduction is implemented. That would be in contradiction of the express textual objective of the reg of maintaining safety. All right. Do you want to say anything about the dig issue? I'm sorry. I feel like I used up all your time. Do you want to say anything about the dig issue briefly? Your Honor, I think we're happy to rest on the briefs. I would just say that my friend on the other side said that there was no data to verify that we complied with the reg if we used the R-string method. The R-string data is in the record. It's one column over from the B31G data. PHMSA could have verified that there was no 180-day condition based on the R-string data. Do you have a role in that? There is some idea where you're confirming it. You're the ones. They're not there. You're confirming doing this stuff. I mean, is there anything to that argument that if you're not providing the backup information, if you're not running down the details, that makes their job more difficult in terms of trying to figure out compliance later on? I don't think so, Your Honor. The R-string values were provided by a Wolverine vendor. There's nothing in the reg, nothing that I'm aware of. But why did you go through the steps that you do with respect to the other method when you did? I don't think there's anything that required us, after the fact, to basically do the calculations again. And there's no... But you did, right? I mean, you verified it. You ran them yourselves, whatever it was that there was testimony about it, obviously, at the hearing. Right, right. That is true as to the B31G. But I don't think that that's required by the reg. And there's no contest here that the calculations are correct. Okay. Any questions? Okay, thank you. Thank you, Your Honor. The case will be submitted. And I think we've got one more case.